Case No. 19-1177

---

In the

**UNITED STATES COURT OF APPEALS**

**For the Sixth Circuit**
───────────────────────

**Marie Mayerova, et al.**

*Plaintiffs-Appellees*

v.

**Eastern Michigan University, et al.**

*Defendants-Appellants*

**On Appeal from the United States District Court
For the Eastern District of Michigan, Southern Division**
───────────────────────

**EMERGENCY MOTION TO STAY PRELIMINARY INJUNCTION:
ACTION REQUESTED BEFORE APRIL 1, 2019**

**Miller, Canfield, Paddock and Stone, P.L.C.**
**Brian Schwartz**
**Robert Zielinski**
**Paul Hudson**
**Attorneys for Defendants-Appellees**
**150 West Jefferson, Suite 2500**
**Detroit, MI 48226**
**(313) 963-6420**

# I.    INTRODUCTION

Last spring, Eastern Michigan University ("EMU") made a difficult budgetary decision to eliminate four sports teams.  Two were men's teams and two were women's teams.  Seventy percent of the athletes on the disbanded teams were men, and 30 percent were women.  Plaintiffs nonetheless filed this lawsuit alleging that EMU's action discriminated against women and thus violated Title IX.

The district court entered a preliminary injunction requiring EMU to immediately resurrect the two women's teams.  The two teams—softball and tennis—had already been disbanded for months when the lawsuit was filed and have now been gone for almost a year.  Yet the district court ordered EMU to recreate the teams, essentially from scratch, and to do so immediately.  The court ordered EMU to "hire a softball coach no later than April 1, 2019," ready the field, order uniforms and equipment, and start scheduling games, among other things.  (Order Granting Injunctive Relief, RE55, PageID#1944; attached as Exhibit 1.)  The court did the same for tennis, setting a recruiting budget, allocating scholarships, and ordering the school to start "organizing competitive tournament and conference schedules, equipment and uniform orders," and so on.  (*Id.* at PageID#1943.)

EMU asks this Court to stay the preliminary injunction pending appeal.[1] Title IX does not permit federal judges to serve as athletic directors. The district court's order significantly alters—rather than maintains—the status quo, by ordering EMU to reassemble, at a cost to the university of $1 million per year, two sports programs that were disbanded a year ago. And because creation of a sports program is inherently a long-term and costly endeavor, the nominally "preliminary" injunction effectively provides the full and final relief that Plaintiffs ultimately seek. On top of that, the order requires EMU to take immediate actions—including hiring a softball coach by April 1 and recruiting players—that would be exceptionally hard or perhaps impossible to undo if EMU were to prevail in this appeal or ultimately on the merits. And even if EMU could find *some* softball coach by April 1, the compressed timeframe and awkward timing—right in the middle of college softball season for candidates coaching at other schools— means there is no guarantee EMU would be able to locate a qualified, much less top-notch, candidate.

The district court's preliminary injunction therefore threatens irreparable harm to EMU, to the interests of other student-athletes, and to the public interest. If the preliminary injunction stands, EMU will be forced to divert

---

[1] Prior to the district court's February 12, 2019 Order, EMU reinstated the women's tennis team and EMU therefore is not seeking a stay of the portion of the Order that addresses tennis.

resources from the creation and expansion of other women's sports programs that it believes offer greater opportunity for female student-athletes in a far more economically sustainable manner. These potential harms are even more acute because EMU faces severe budget issues. The injunction also offends the public interest in federalism and comity by substituting a federal judge's views on how to run a university athletic department for those of the elected and appointed public officials responsible for the academic, financial, and general well-being of EMU.

EMU respectfully asks the Court to stay the preliminary injunction to preserve the true status quo pending appeal. EMU brings this motion on an emergency basis pursuant to FRAP 8 and 27 and Sixth Circuit Rule 27(c) due to the imminent April 1 deadline.

## II.     FRAP 8(a)(2)(A)(i) STATEMENT:  WHY MOVING FIRST IN THE DISTRICT COURT WOULD BE IMPRACTICABLE AND WHY EMERGENCY RELIEF IS NECESSARY

FRAP 8(a)(1) provides that a party seeking a stay pending appeal "must ordinarily move first in the district court[.]" But a party may move for a stay directly in this Court if "moving first in the district court would be impracticable[.]" FRAP 8(a)(2)(A)(i).

Moving first in the district court would be impracticable here. The district court's preliminary injunction requires EMU to take immediate actions. Among other things, the injunction requires EMU to hire a softball coach by April 1, 2019,

a little more than a month from now.  (Order Granting Injunctive Relief, RE55, PageID#1944.)  The injunction requires EMU not just to begin the hiring process but to "*hire*" the coach by April 1, which means that EMU must post the job and begin recruiting and interviewing coach candidates immediately.  (*See id.*; emphasis added.)  Even extending an offer by April 1 might not suffice; the injunction says EMU must "hire" a coach by April 1.  (*See id.*)

With the clock ticking on EMU's April 1 deadline to complete the hiring, it would have been impracticable to move for a stay in the district court first.  Even if the district court had been able to rule on a fully briefed motion to stay by April 1, if the court denied the motion it would have been nearly impossible for the parties to then brief a motion to stay in this Court and receive a ruling before the hiring deadline.  At a minimum it would have been "impracticable" to attempt to get rulings from two courts in that compressed timeframe.  FRAP 8(a)(2)(A)(i).

In short, time is of the essence and irreparable harm looms.  As noted above, if EMU is forced to hire a softball coach by April 1, that action may, as a practical matter, be irreversible.  Even if EMU were to prevail in this appeal several months from now—that is, if this Court agreed with EMU that the district court erred by awarding ultimate relief in a preliminary injunction—it would be too late.  The "preliminary" injunctive relief might permanently create a softball program that

EMU cannot afford and that actually hampers EMU's ability to improve participation rates for female student-athletes.

EMU therefore files this motion for stay directly in this Court because "moving first in the district court would be impracticable" under FRAP 8(a)(2)(A)(i). And EMU seeks emergency relief to request this Court's action before the district court's April 1 deadline.

## III. PROCEDURAL BACKGROUND

Plaintiffs filed their original Complaint and motion for preliminary injunctive relief on June 15, 2018. The Complaint alleged that EMU was not in compliance with Title IX because EMU "do[es] not provide female students with varsity athletic participation opportunities in a number substantially proportionate to female undergraduate enrollment." (Complaint, ¶80, RE1, PageID#28).[2]

The district court held a two-hour hearing on Plaintiffs' request for preliminary injunctive relief, but *sua sponte* limited the witnesses and areas of testimony to be presented. (Transcript at 47, RE40). On September 27, 2018, the Court entered an Opinion and Order Granting Plaintiffs' Motion for Preliminary Injunction, but did not direct EMU to take any specific actions. (Opinion at 37, RE45, PageID#1761 (attached as Exhibit 2)). The court "recognize[d] that its ability to craft a solution is limited and that often the parties are in a better position

---

[2] Although Plaintiffs filed an Amended Complaint, their request for preliminary injunctive relief was based on the allegations in their original Complaint.

to accommodate the interests of both sides." (*Id.*)  The Court therefore ordered a status conference "to discuss implementation of the court's order," and the parties thereafter held extensive discussions both with and without the court.  Those discussions ultimately proved fruitless.  Following further briefing, the district court entered its Order Granting Injunctive Relief on February 12, 2019, affirmatively requiring EMU to establish two new sports.  (Order Granting Injunctive Relief, RE55, PageID#1941-1945).  EMU has appealed both the September 27, 2018 and February 12, 2019 rulings.  (Notice of Appeal, RE49, PageID#1832-1833; Notice of Appeal, RE56, PageID#1496-1498).

## IV.  STATEMENT OF FACTS

In March 2018, EMU announced that, due to serious budget issues, it was making across-the-board budget reductions.[3]  In athletics, a 7% reduction was required, on top of significant cuts made earlier in the year.  This resulted in eliminating four varsity sports teams effective at the end of each sport's Spring 2018 season: men's wrestling, men's swimming and diving, women's softball, and women's tennis.

The eliminations affected male student-athletes disproportionately.  During the 2017-18 academic year, 83 students had participated in the affected sports, of

---

[3] For seven years EMU has operated with a worsening budget deficit resulting from a variety of factors ranging from declining state support, declining enrollment for credit hours, and shifts in enrollment patterns.

whom 58 (70%) were male and 25 (30%) were female. This compared to an overall student-athlete population that was 57% male and 43% female. The elimination of each sport resulted in EMU terminating staff, releasing prospective student-athletes from commitments to attend EMU, waiving transfer restrictions for existing student-athletes, disposing of equipment, and informing the Mid-American Conference that EMU would no longer be fielding the affected teams. All of these steps were completed before the Complaint was filed. Overall, the cuts reduced the athletics department's $28M budget by about $2M. The cost of maintaining the women's softball and tennis teams was approximately $1M. (*See* Opinion at 34, RE45, PageID#1758).

As a result of the sports eliminations and efforts to increase female participation, the percentage of athletes who were female grew substantially, from 43% in the 2017-18 academic year to approximately 50% by the time the district court issued its February 12 preliminary injunction. This percentage remained below the percentage of undergraduates who were female (59%). EMU presented evidence of its intent to further increase both the absolute number and proportion of athletics opportunities on women's teams by expanding sports such as women's crew and by adding a women's lacrosse team. EMU also presented evidence that these efforts would create more opportunities for female student-athletes compared with establishing softball and tennis, and would do so in a manner that was more

likely to be sustainable in terms of cost and students' interests. The University proposed an alternative order that would have required it to maintain female participation at its current level or higher and not eliminate any women's sports or take any steps that would prohibit introduction of any particular women's sport if ultimately ordered to do so. ([Proposed] Preliminary Injunction, RE53-6, PageID#1903-1908).[4]

## V. STANDARD OF REVIEW

In determining whether to grant a stay pending appeal, this Court considers four factors: (1) the likelihood that the moving party will prevail on the appeal, *i.e.* succeed in overturning the preliminary relief; (2) whether the movant will experience irreparable injury if the injunction is left in place; (3) the prospect that others will be harmed if the stay is granted and (4) the public interest in granting the stay. *Service Employees Int'l Union v. Husted*, 698 F.3d 341, 343-44 (6th Cir. 2012); *Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1099 (6th Cir. 2006).

## VI. ARGUMENT

Each of the four factors favors a stay of the injunction while this Court considers EMU's appeal. The district court's preliminary injunction is based on an

---

[4] Although EMU submitted a Proposed Alternative Preliminary Injunction, it continued to dispute that Plaintiffs were entitled to any preliminary injunctive relief and reserved the right to challenge any injunction on appeal. (Defendants' Response at 2-3, n.1, RE54, PageID#1859-1860).

erroneous view of Title IX and the nature of the conduct that can give rise to a private cause of action. The scope of the preliminary relief will cause irreparable harm to EMU by (a) forcing EMU to incur substantial irrecoverable costs and (b) hamstringing EMU's efforts to expand women's athletics in a manner that is much more likely to be successful and sustainable. The likelihood of harm to others also favors a stay. Plaintiffs elected to proceed as a putative class, seeking to "represent a class of all present, prospective, and future female" student-athletes at EMU. (Amended Complaint, ¶35, RE41, PageID#1632) (emphasis added). Ordering the creation of the softball program without thorough consideration of other options for expanding women's athletic opportunities subordinates class members who want to play different sports than plaintiffs. Finally, the public interest favors a stay for the same reasons and because EMU, as a state constitutional entity, should be allowed an opportunity to reach compliance in a manner that is consistent with its budget and educational imperatives.

Simply put, EMU asks the Court to stay the preliminary injunction to preserve the status quo pending appeal. The preliminary injunction, if left in place during EMU's appeal, will cause immediate irreparable harm, including by forcing EMU to hire a softball coach and expending considerable other resources for a team that does not currently exist and that might not exist at the end of this appeal. For all of these reasons, a stay pending appeal is appropriate.

A.    **EMU HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF THE APPEAL.**

The district court abused its discretion in granting preliminary injunctive relief.  In issuing the injunction, the court found that Plaintiffs had a substantial likelihood of success based on a mistaken interpretation of the reach of Title IX.  First, the court determined that the elimination of the two women's teams as part of the larger decision to cut costs was in itself a violation of Title IX, even though Title IX has never been held to entitle a student participate in a particular sport.  Second, a private right of action under Title IX is limited to claims for intentional discrimination based on gender.  Here, the elimination of the women's teams was undisputedly part of a single budget decision that disproportionately affected *male* student-athletes, not females.  Thus, eliminating softball and tennis was not a Title IX violation.  Third, requiring EMU to affirmatively reinstate softball, particularly in view of the long-term consequences, contravenes the limited purposes of preliminary relief.

The court erroneously concluded that the elimination of the softball and tennis teams as part of the decision to cut four sports violated Title IX.  Title IX does not require the maintenance of any particular sports.  Its sole concern is with the overall allocation of athletic participation opportunities and resources between genders.  *Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir. 1993) ("Title IX does not require institutions to fund any particular number or type of athletic

opportunities."); *Gonyo v. Drake Univ.*, 837 F.Supp. 989, 994 (S.D. Iowa 1993) ("Title IX does not establish a right to participate in any particular sport in one's college."). *See also Roberts v. Colorado State Board of Agriculture*, 998 F.2d 824, 833 (10th Cir. 1993). Compliance with Title IX can be achieved by adding women's sports, deleting men's sports, or a combination thereof. *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 610 (6th Cir. 2002). Thus, adding or deleting particular sports can be significant to Title IX compliance only insofar as it affects the overall distribution of athletic participation opportunities. Here, the undisputed evidence established that EMU's budget reductions disproportionately affected male student-athletes: after the reductions the proportion of athletic opportunities on women's teams actually *increased* from 43% to 50%. This undercuts the notion that the budget actions were themselves intentional gender discrimination in violation of Title IX.

This same consideration highlights the inappropriate nature of the mandatory relief ordered. First, because Title IX compliance ultimately involves the balancing of interests of a variety of constituencies against the limited resources available to an institution of higher education, courts have recognized that allowing a defendant to propose a Title IX compliance plan at the preliminary injunction stage is more appropriate than simply accepting a plaintiff's preferred form of relief or ordering the specific steps it deems most appropriate. *Landow v. Sch. Bd.*

*of Brevard Cty.*, 132 F. Supp. 2d 958, 967 (M.D. Fla. 2000); *Daniels v. Sch. Bd. of Brevard Cty., Fla.*, 985 F. Supp. 1458, 1463 (M.D. Fla. 1997) (citing *Cohen*, 101 F.3d at 185–88).   Second, by requiring EMU to immediately create the softball team, the district court granted the named plaintiffs the full relief to which they would have been entitled after a full trial on the merits, and did so in way that will foreclose other options for EMU to pursue compliance.   The primary purpose of preliminary equitable relief is "to preserve the relative position of the parties," not to decide the ultimate merits of the action.   *Univ. of Texas v. Camenish,* 451 U.S. 390, 395 (1981).   As a result, mandatory injunctions and those effectively granting final relief are particularly disfavored.   *Shrier v. Univ. of Colorado,* 427 F.3d 1253, 1259 (10th Cir. 2005); *Cox v. Jackson,* 579 F. Supp. 2d 831, 855 n.6 (E.D. Mich. 2008).

The district court also erred by overestimating the Plaintiffs' likelihood of success on the merits.   The court based its conclusions solely on the statistical disparity between male and female representation that existed before the program reductions, finding that EMU would be unable to establish affirmatively that it was taking sufficient steps to eliminate the disparity.   But Title IX and the Equal Protection Clause, the two sources of rights claimed in the Complaint, permit a private right of action only to remedy instances of intentional discrimination.   *Alexander v. Sandoval*, 532 U.S. 275 (2001) (holding that identical language in

Title VI of the Civil Rights Act permits an implied private right of action only for intentional discrimination); *Cannon v. University of Chicago*, 441 US. 677, 694-95 (1979) (holding that Congress intended Title IX to be interpreted consistently with Title VI); *Horner v. Kentucky High School Athletic Ass'n,* 43 F.3d 265, 276 (6th Cir. 1994) (Equal Protection claim of gender discrimination requires proof of intentional discrimination). Neither the mere existence of a statistical disparity nor the absence of affirmative action to address an alleged disparity constitutes intentional discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 258-59 (1981) (Title VII's ban on intentional discrimination "does not require an employer to restructure his employment practices to maximize the number of minorities and women hired."); *Holden v. Owens-Illinois*, 793 F.2d 745, 749 (6th Cir. 1986) ("Title VII does not require the adoption of affirmative action programs"); *Manoharan v. Columbia College,* 842 F.2d 590, 594 (2d Cir. 1988).

Indeed, Title IX expressly prohibits preferential treatment on account of statistical disparities between participants and members of any community at large. Title IX states that:

> Nothing contained in [§1681(a)] shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of person of that sex in any community, State, section or

13

other area: provided that [consideration of statistical evidence of imbalances will be allowed.]

20 U.S.C. §1681(b). Here, the district court's conclusion that Plaintiffs were likely to succeed on the merits ignores these limits on a private cause of action under Title IX as well as the undisputed fact that reductions had a greater adverse effect on male, rather than female, student-athletes.

The district court's reliance on sub-regulation-level administrative policy guidance issued by the Office of Civil Rights ("OCR") was misplaced because the 1979 OCR Policy Interpretation[5] is not directly enforceable in a private cause of action. In *Alexander v. Sandoval*, the Supreme Court held that under identical provisions of Title VI, there was no private action to enforce regulations promulgated by the Department of Justice prohibiting disparate-impact discrimination because those regulations did more than prohibit intentional discrimination. 532 U.S. at 285-86. Here, the Policy Interpretation states that OCR will consider a university in compliance with Title IX if (a) its athletic participation rates are substantially proportionate to the gender composition of the student body, (b) the institution has a continuous history of expanding women's programs, or (c) if the university can show that all athletic interests of the underrepresented gender are being met despite the disparity. As set forth above, however, the Policy Interpretation's theory of compliance is inconsistent with

---

[5] https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html.

binding definitions of intentional discrimination. Thus, even assuming the Policy Interpretation is a legitimate exercise of OCR's authority to measure compliance with Title IX for administrative and funding purposes, lack of compliance for those purposes is not the same thing as intentional discrimination. Only the latter can support a private right of action. *See also Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 913-14 (6th Cir. 2004) (applying *Alexander* to deny a private cause of action under regulations promulgated under the Americans with Disabilities Act when the regulations "create obligations not necessarily created by the statute.").

The district court's imposition of mandatory obligations equivalent to final relief and its failure to recognize the limits imposed on a private right of action by the Supreme Court provide alternative and independent reasons establishing that EMU has a substantial likelihood of prevailing on appeal.

**B.   ABSENCE OF A STAY WILL CAUSE EMU IRREPARABLE INJURY.**

Failure to stay the preliminary injunction order will cause substantial irreparable injury to EMU. The court acknowledged that establishing the two previously discontinued sports would cost EMU approximately $1 million. If Plaintiffs are ultimately found not to be entitled to the establishment of these two sports, the costs incurred by EMU in creating new sports and in operating them during the period that the injunction remains in effect will not be recoverable. Out-

of-pocket costs of compliance with a preliminary order constitute irreparable injury if there is no practicable way that they can be recovered. *Oderbrecht Construction v. Florida Dept. of Transportation*, 715 F.3d 1286, 1289 (11th Cir. 2013); *Iowa Utilities Board v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996). This is particularly the case here because there is no dispute that EMU is already experiencing significant budget difficulties.

Beyond these unrecoverable financial losses, failure to stay the preliminary injunction threatens substantial harm to EMU's Title IX compliance efforts. EMU provided the district court with a roadmap to achieving compliance by limiting roster sizes on men's teams, increasing participation in certain women's sports where additional interest exists, and adding a women's lacrosse team.[6] EMU explained why these steps were more likely to achieve actual statistical parity than reestablishing softball, and explained how they would do so in a more economically sustainable manner.

The district court's order forecloses EMU from pursuing this path to statistical parity in several ways. First, the substantial resources required to

---

[6] The University's plan is based on a variety of factors including the relatively larger size of average women's lacrosse rosters compared with softball, the fact that women's lacrosse is a fast growing sport whereas interest in softball is declining amongst female students in Michigan high schools, the relatively lower cost in total and per-athlete terms of lacrosse, and the fact that EMU's softball team has not been able to fill all of its available roster spots in each of the past several years. (*See* Wetherbee Letter, RE54-2, PageID#1875-1877).

establish softball will no longer be available to pursue alternative initiatives. Second, it is not feasible to establish the softball team for only a limited time period or to discontinue it should the preliminary injunction be lifted without incurring substantial additional costs. For example, athletes are generally recruited with the expectation that they will enroll for four to five years, and capital improvements are amortized over the improvement's useful life. Additionally, it is unlikely that EMU could recruit athletes or coaches of a caliber that will provide an equal competitive experience to its other teams (another measure of Title IX compliance) unless the University commits to the programs for the long term. In other words, the practical effect of the district court's preliminary injunction might be to establish softball on permanent basis.

Establishing softball will adversely affect EMU's ability to achieve Title IX compliance as measured by the OCR Policy Interpretation, which in turn would threaten its federal funding. As noted above, Title IX administrative compliance is a matter of balancing opportunities to participate in athletics in proportion to gender representation and interest in the student body. Adding softball, due to its limited roster size, is unlikely to allow EMU to reach substantial proportionality without adding one or more additional women's sports, a financial impossibility. On the other hand, adding lacrosse, which carries a larger roster, coupled with EMU's plans to grow existing women's sports, is likely to result in substantial

proportionality between the percentage of female students and female student-athletes without the need to add any additional sports. Because each additional sport that is added requires a coaching and training staff as well as administrative support, the ability to reach and maintain parity with fewer sports is critical to sustaining a Title IX-compliant athletics program.

The district court's order straightjackets EMU. To impose this solution on the very limited record is an abuse of its discretion.

## C. FAILURE TO STAY THE ORDER THREATENS SUBSTANTIAL HARM TO OTHERS AND TO THE PUBLIC INTEREST.

The preliminary injunction also threatens harm to other persons as well as to the public interest. Universities in the State of Michigan enjoy a unique constitutional status. The Michigan Constitution provides that the governing board of institutions of higher education "shall have general supervision of the institution and the control and direction of all expenditures from the institution's funds." Const 1963, art 8, §§5, 6. These provisions grant the universities autonomy in how they manage their respective budgets. *See, e.g.*, *Regents of Univ. of Mich. v State*, 47 Mich. App. 23, 52; 208 N.W.2d 871 (1973). Thus, Michigan public policy, as enshrined in its Constitution, favors deferring to the University's budgetary decisions, particularly in the absence of Plaintiffs demonstrating that the remaining preliminary injunction factors favor injunctive relief. Undue micromanagement of state public officials in carrying out their constitutionally assigned duties offends

the public interest in federalism. *Flower Cab company v. Petitte,* 685 F.2d 192, 194 (7th Cir. 1982). "[T]he public interest, 'weighs in favor of permitting colleges and universities to chart their own course in providing athletic opportunities without judicial interference or oversight, absent a clear showing that they are in violation of the law.'" *Equity in Athletics v. Dep't of Educ.,* 504 F. Supp. 2d 88, 112 (W.D. Va. 2007) (quoting *Gonyo,* 837 F. Supp. at 996).

Failure to grant a stay further threatens harm to others, particularly the putative class members. Over 20,000 graduate and undergraduate students are enrolled at EMU.[7] The decision to reduce sports was made almost a year ago for budgetary reasons. The reductions allow the University to realign and focus its resources on academic programs and facilities. Requiring the University to establish two of the four disbanded teams (softball and women's tennis) would divert resources from educational programs, thereby harming the rest of the student body who have no connection to intercollegiate athletics. Furthermore, Plaintiffs filed their complaint as a putative class action on behalf of a class of women who attend or may attend EMU in the future. By forcing EMU to devote significant resources to softball, the order necessarily redirects resources from other sports in which class members might have an interest as well as other legitimate academic initiatives and priorities that will affect the student body as a whole.

---

[7] (https://www.emich.edu/facts/index.php).

**D. PLAINTIFFS WILL NOT BE HARMED BY A STAY PENDING APPEAL.**

Plaintiffs also failed to meet their burden to prove irreparable harm in the district court and cannot show irreparable harm if a stay is granted. The University announced the discontinuation of the four sports in March 2018, precisely so that the affected student-athletes would have adequate time to secure opportunities to play their sports at other schools, if they chose to do so. Plaintiffs waited for three months—until long after the University took affirmative steps to discontinue the sports—to seek injunctive relief. This delay "undermines [Plaintiffs'] allegation of irreparable harm." *Wells Fargo v. WhenU.com*, 293 F. Supp. 2d 734, 772–72 (E.D. Mich. 2003). Indeed, courts routinely find that "[a] delay between the discovery of the allegedly infringing conduct and the request for injunctive relief can support an inference that the alleged harm is not sufficiently severe or irreparable to justify injunctive relief." *Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 713-14 (S.D. Ohio 2015) (internal quotation omitted).

Additionally, courts have found irreparable harm lacking where, as here, "student-athletes would not lose their scholarship funding if they chose to stay at [their university] and [where] the students were free to transfer to other colleges offering their chosen sport . . . so that those athletes were still able to compete at the college level." *Equity in Athletics v. Dep't of Educ.*, 291 F. App'x 517, 521 (4th Cir. 2008). *See also Miller v. Univ. of Cincinnati*, 2007 WL 2783674, at *11

20

(S.D. Ohio Sept. 21, 2007) ("Plaintiffs have not proved they will suffer an irreparable injury if the University is not enjoined from terminating the program. The University has committed itself to continuing scholarship assistance to any rower who will not be able to compete because of termination of the program. It has also agreed to 'release' under NCAA rules any rower who wishes to remain in competitive collegiate rowing to transfer to another school."); *Gonyo,* 837 F. Supp. at 994 ("Plaintiffs' desire to complete their college education and intercollegiate wrestling at Drake, the school of their choice, is understandable, but Title IX does not establish a right to participate in any particular sport in one's college."). Here, all of the students affected by the program reductions were guaranteed continued financial aid at their previous levels. For students who wished to transfer, EMU made all necessary arrangements to facilitate the transfer. Thus, neither the named plaintiffs nor the class they wish to represent are threatened with significant harm if the preliminary injunction order is stayed pending this appeal.

## VII.  CONCLUSION

For all these reasons, EMU respectfully asks the Court to stay the preliminary injunction pending the outcome of this appeal.

Respectfully submitted,

/s/ Brian M. Schwartz
Miller, Canfield, Paddock and Stone, P.L.C.
Attorneys for Defendants
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
(313) 963-6420
schwartzb@millercanfield.com

February 22, 2019

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned certifies that this motion complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2)(A).

The motion has been prepared in proportional typeface using Times New Roman (14 point). The motion was typed using Microsoft Office Word 2010. That program has a function which calculates the total number of words contained in a document. According to that program function, there are 4,947 words, including footnotes, in this motion, not including the parts excluded by Federal Rule of Appellate Procedure 32(f).

By: s/Brian M. Schwartz
Brian M. Schwartz (P69018)
February 22, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2019, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all registered users.

By:  s/Brian M. Schwartz
Miller, Canfield, Paddock and Stone, P.L.C.
Attorney for Defendant-Appellee
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
313-963-6420
schwartzb@millercanfield.com